IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MICHAEL ANTHONY WRIGHT, SR.,

        Plaintiff,

v.                                Case No. 12-cv-870

DOCTOR BAYNTON, et al.,

        Defendants.

---

## DEFENDANTS' BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Michael Wright does not agree with the medical treatment decisions of DOC personnel. However, such disagreement does not amount to a violation of the Eighth Amendment and, as such, defendants are entitled to summary judgment.

### BACKGROUND FACTS

**A. Statement of the Case.**

Wright is an inmate who was incarcerated at Dodge Correctional Institution (DCI) at all times relevant to this action. (DPFOF, ¶ 1). Defendants are employees of the Wisconsin Department of Corrections (DOC). (DPFOF, ¶ 2). Dr. Charles Baynton is employed by the DOC as a physician within the Health Services Unit (HSU) at DCI. (DPFOF, ¶ 3). Dr. Scott Hoftiezer is employed by the DOC as an Associate Medical Director and also works at DCI as a physician. (DPFOF, ¶ 4). Beth Dittmann is employed by the DOC as the HSU Manager at DCI. (DPFOF, ¶ 5).

Pursuant to the Screening Order, Wright was allowed to proceed on his allegations that defendants, starting in May 2012, failed to provide adequate medical treatment for Wright's Hepatitis C (HCV) infection. (DPFOF, ¶ 6).

### B. Treatment for HCV Involves Complex Decisions.

HCV is an infectious disease affecting primarily the liver. (DPFOF, ¶ 7). The infection is often asymptomatic, but chronic infection can lead to scarring of the liver and ultimately to cirrhosis, which is generally apparent after many years. (*Id.*). Of every 100 persons infected with a positive HCV, about:

- 75 to 85 persons may develop long-term infection

- 70 persons may develop chronic liver disease

- 15 persons may develop cirrhosis over a period of 20 to 30 years

- Less than 3% of persons may die from the consequences of long term infection (liver cancer or cirrhosis).

(DPFOF, ¶ 8).

HCV infection, if treated, is treated with antiviral medications intended to clear the virus from a patient's body. (DPFOF, ¶ 9). Antiviral medications can cause depression and flu-like signs and symptoms, such as fatigue, fever and headache. Some side effects can be serious enough that treatment must be delayed or stopped in certain cases. (DPFOF, ¶ 10). Even initiation of treatment is contraindicated for some individuals with HCV. (DPFOF, ¶ 11). Specific guidelines have been provided to DOC by Hepatology specialists from the University of Wisconsin Hospital and Clinics (UWHC) Hepatology Clinic. (DPFOF, ¶ 12). DOC has guidelines in place to determine when to treat patients with HCV, to establish a care plan and to make sure inmates are making an informed choice for HCV treatment. (DPFOF, ¶ 13).

One contraindication for treatment is a low absolute neutrophil count. (DPFOF, ¶ 14). Neutrophils are a type of fully developed white blood cells, which play a key role in the human body's ability to ward off infections and diseases. (DPFOF, ¶ 15). These cells engage and consume foreign substances, such as dead cells, bacteria, and waste products in the blood. (*Id.*). The body also relies upon neutrophils to effectively break down and utilize proteins for more efficient use. (*Id.*). A low absolute neutrophil count is problematic because it is an indicator that a person's immune system is not as strong. (DPFOF, ¶ 16). The drugs given to treat HCV are immunosuppressants and lower a person's defenses against other infections as they treat the HCV virus. (DPFOF, ¶ 17). One needs a basically competent immune system to be able to tolerate treatment. (*Id.*).

When neutrophils are low, a drug called Neupogen may be used to help increase the level of the neutrophils. (DPFOF, ¶ 18).  However, there are considerable risks in using Neupogen in patients with HCV.  (*Id.*). Neupogen causes some liver inflammation with elevated alkaline phosphatate levels in 21% of patients to whom it's given. (DPFOF, ¶ 19). Normally a person with a healthy liver is in little danger from this, but there is greater risk to a patient who has liver damage to start with. (*Id.*). Neupogen has other frequent systemic side effects, even when given to patients without hepatitis:

- Central nervous system: Fever (12%)
- Dermatologic: Petechiae (≤17%), rash (≤12%)
- Endocrine & metabolic: LDH increased, uric acid increased
- Gastrointestinal: Splenomegaly (severe chronic neutropenia: 30%; rare in other patients)
- Hepatic: Alkaline phosphatase increased (21%)
- Neuromuscular & skeletal: Bone/skeletal pain (22% to 33%; dose related), commonly in the lower back, posterior iliac crest, and sternum
- Respiratory: Epistaxis (9% to 15%)

3

(DPFOF, ¶ 20). All these potential side-effects have a greater risk of causing harm to someone who is already chronically ill with hepatitis. (*Id.*).

At all times relevant to this case, Wright's absolute neutrophil count was below the level deemed acceptable for initiation of HCV treatment. (DPFOF, ¶ 21). With a low absolute neutrophil count, Wright's risk of complications from the treatment would be much higher because his immune system is starting out lower than deemed safe for typical HCV treatment. (DPFOF, ¶ 22).

### C. Chronology of Wright's Relevant Medical Care.

On April 24, 2012, Dr. Hoftiezer ordered initial lab work as part of Wright's intake as an inmate at DCI. (DPFOF, ¶ 23). On April 30, 2012, Dr. Baynton met with Wright for his intake physical examination. (DPFOF, ¶ 24). Dr. Baynton's evaluation included following up on Wright's report of having HCV. (*Id.*). Dr. Baynton requested outside records concerning Wright's previous treatment for his HCV and planned to review these records. (*Id.*). He also ordered a repeat liver chemistry in 3 months and follow-up with Wright in 4 months. (*Id.*).

On May 1, 2012, Wright submitted a Health Service Request (HSR) asking for previously prescribed medications, including those for HCV treatment. (DPFOF, ¶ 25). On May 2, 2012, Dr. Baynton responded to Wright that, as Dr. Baynton had explained to him during his intake physical, the decision as to whether DOC would restart Wright's previously interrupted HCV treatment is a complex one, and that it would be a matter of months before that question could be resolved. (DPFOF, ¶ 26).

On May 3, 2012, Wright submitted a HSR wanting to speak with Dr. Hoftiezer concerning his prescribed medication for HCV. (DPFOF, ¶ 27). On May 7, 2012, Dr.

4

Hoftiezer responded to Wright's HSR, stating that HCV treatment could not be started at that time because Wright failed to complete the treatment he was receiving in 2011. (DPFOF, ¶ 28). Dr. Hoftiezer also informed Wright that he may be considered for new treatment in the future. (*Id.*).

On May 6, 2012, Dittmann responded to an interview/information request submitted by Wright. (DPFOF, ¶ 29). In his request, Wright was asking about receiving medication for his HCV that was initially denied. (*Id.*). Dittmann responded to Wright directing to him to see Dr. Hoftiezer's May 7, 2012 response to Wright's Health Service Request dated May 3, 2012. (*Id.*).

On May 30, 2012, Dr. Baynton reviewed Wright's chart and the medical records received from the Racine/Wheaton Franciscan Medical Group (WFMG).  (DPFOF, ¶ 30). The WFMG records indicated that on July 8, 2011, Wright stopped his HCV treatment after 12 weeks due to side effects.  (DPFOF, ¶ 31).

On June 17, 2012, Wright submitted a HSR wanting an ultrasound or biopsy for his HCV condition. (DPFOF, ¶ 32). On June 20, 2012, Nurse Burling saw Wright and spoke with him about his HCV concerns. (DPFOF, ¶ 33). Nurse Burling informed Wright that there were no immediate plans for an ultrasound or biopsy of his liver related to Wright's HCV condition.  (*Id.*). Wright was also advised that he could write to Dr. Baynton to discuss his HCV treatment if he did not want to wait until his next appointment with Dr. Baynton. (DPFOF, ¶ 34).

On August 29, 2012, Dr. Baynton saw Wright for follow-up of his HCV. (DPFOF, ¶ 35). Wright indicated the reason he stopped his HCV treatment was not due to side-effects, but to lack of insurance to cover the medication, Neupogen, which is used

for low white blood count while undergoing HCV treatment.  (*Id.*). Wright indicated that he still wanted to go back on treatment.  (DPFOF, ¶ 36). Dr. Baynton reviewed Wright's outside records from WFMG and noted that on July 8, 2011 there was telephone note stating the HCV treatment was stopped due to side effects, but a June 7, 2011 note in these same records reflects that Wright was tolerating the treatment well. (DPFOF, ¶ 37). Due to confusion in WFMG's medical records, Dr. Baynton ordered an ultrasound of Wright's liver, a repeat liver lab in 5 months and to follow-up in 6 months. (DPFOF, ¶ 38).

On August 31, 2012, Dr. Baynton discussed Wright's HCV condition with Dr. Hoftiezer.  (DPFOF, ¶ 39). In light of past interrupted treatment involving 2 drug therapy, Dr. Baynton consulted with Dr. Hoftiezer and questioned if a 3 drug therapy would be appropriate due to Wright's previous treatment failures on the 2 drug therapy. (DPFOF, ¶ 40). Dr. Hoftiezer felt that, if appropriate, Wright may be eligible for 3 drug therapy. (DPFOF, ¶ 41). HCV treatment is provided at only a few institutions within the DOC. (DPFOF, ¶ 42). DCI is not an institution that oversees 3 drug therapy for HCV therapy. (DPFOF, ¶ 43).

After Dr. Baynton's consultation with Dr. Hoftiezer, Dr. Baynton ordered a follow-up in one month and sent Wright a note indicating that he had reviewed his situation regarding HCV with his supervisor. (DPFOF, ¶ 44). Dr. Baynton also informed Wright that the potential for referral for another attempt at treatment was greater than he had thought, and that Dr. Baynton would see Wright back in the next month to discuss this further. (DPFOF, ¶ 45).

On September 5, 2012, an abdominal ultrasound was completed and it indicated fatty liver.  (DPFOF, ¶ 46).

On September 26, 2012, Dr. Baynton saw Wright, who reaffirmed his interest in treatment. (DPFOF, ¶ 47). Wright informed Dr. Baynton that he was reluctant to go to Jackson Correctional Institution (JCI) for the 3 drug therapy. (DPFOF, ¶ 48). JCI is one of the institutions that provides the 3 drug therapy for HCV treatment. (DPFOF, ¶ 49). Dr. Baynton then ordered pre-HCV treatment work-up, including blood work, EKG (electrocardiogram) and a stress test. (DPFOF, ¶ 50). Dr. Baynton also ordered follow-up with Wright in one month.  (*Id.*).

On September 28, 2012, a complete blood count was done.  Wright's white blood count, platelet count and neutrophil absolute were all low, which is not unexpected with an individual having HCV. (DPFOF, ¶ 51).

On October 8, 2012, Dr. Baynton wanted to be sure that Wright was willing to transfer to JCI before he scheduled Wright's stress test. (DPFOF, ¶ 52). Dr. Baynton noted this based on Wright's prior comments that he did not want to go to JCI for treatment. (*Id.*).

On October 24, 2012, Dr. Baynton saw Wright and noted that Wright was feeling well. (DPFOF, ¶ 53). Wright was not on any medication other than eye drops for glaucoma.  (*Id.*). Wright stated that he was willing to pursue HCV treatment at whatever institution necessary and was now willing to go to JCI.  (DPFOF, ¶ 54). Dr. Baynton saw Wright's absolute neutrophil count from the September 28, 2012 lab was 1,330 and there were no other absolute neutrophil counts done previously since Wright's incarceration. (DPFOF, ¶ 55). Wright did not meet the criteria for HCV treatment because, per DOC

treatment guidelines, his absolute neutrophil count must 1500 or higher. (DPFOF, ¶ 56). Dr. Baynton's plan was to repeat the lab count and see Wright back in 2 weeks. (DPFOF, ¶ 57). That same day, another lab was taken to check Wright's absolute neutrophil count and it was 1440, which was basically unchanged from the September 28, 2012 lab. (DPFOF, ¶ 58).

On October 26, 2012, Dr. Baynton ordered a cancellation of his November 17, 2012 follow-up appointment with Wright. (DPFOF, ¶ 59). Dr. Baynton informed Wright that his neutrophil count was low and again fell below the minimum needed for HCV treatment to be safe. (*Id.*). Dr. Baynton ordered Wright's follow-up for 6 months. (DPFOF, ¶ 60).

On April 22, 2013, Dr. Baynton saw Wright for an ailment other than his HCV. (DPFOF, ¶ 61). However, Dr. Baynton ordered repeat labs for Wright's HCV. (*Id.*).

On April 26, 2013, Dr. Baynton saw Wright for follow-up of his HCV lab work. (DPFOF, ¶ 62). Dr. Baynton informed Wright that his absolute neutrophil count was 1290 and still less than the 1500 identified as protocol cutoff for eligibility for HCV treatment. (*Id.*). Dr. Baynton explained the rationale for the protocol in place. (*Id.*). Dr. Baynton also discussed Wright's previous community treatment that was interrupted when he developed a neutrophil count of below 500 (the normal is approximately 1800). (DPFOF, ¶ 63). When Wright was not incarcerated, the community treatment physician had proposed Neupogen. (*Id.*). Wright indicated that DOC should provide Neupogen and then treat the HCV. (DPFOF, ¶ 64). Dr. Baynton discussed with Wright that decisions regarding treatment with Neupogen are made at a higher level of specialization and risks were still present.  (*Id.*). Dr. Baynton's plan was to email to Lisa Cervantes, a Physician

8

Assistant at the UWHC Hepatology Clinic, for additional guidance. (DPFOF, ¶ 65). That same day, Dr. Baynton emailed Cervantes for guidance regarding the feasibility of HCV treatment with prior interrupted treatment and use of Neupogen. (DPFOF, ¶ 66).

On May 2, 2013, Cervantes responded via email to Dr. Baynton's April 26, 2013 email. (DPFOF, ¶ 67). Cervantes advised that she would look into the issue and let Dr. Baynton know. (*Id.*). That same day, Cervantes followed up by contacting Dr. David Burnett, DOC's Medical Director. (DPFOF, ¶ 68). Dr. Burnett responded that if Wright became neutropenic on treatment and it had not resolved, they should be evaluating why it had not resolved. (*Id.*). Dr. Burnett suggested that he would review it further and speak with Dr. Baynton about it. (*Id.*).

On May 3, 2013, Cervantes emailed Dr. Burnett regarding the potential use of Neupogen to increase neutrophils and then to treat Wright's HCV.  This email stated as follows:

> I received a question from one of the DOC docs regarding a patient with neutropenia; he was treated before he was in the DOC with the 2-drug regimen and was responding. Unfortunately, he developed rather severe neutropenia and Neupogen was prescribed. The patient was not able to afford the medication and had to stop his hep C treatment. His neutropenia evidently continued after treatment was stopped.  He now wants us to treat him with Neupogen to get his neutrophils up, then treat his hep C.  I told the doc that medically it may be possible to treat him but that I wasn't sure if the DOC would approve it.  What do you think?  I'm inclined to not treat him, but I don't know if he's cirrhotic – I would assume so if his neutrophils are low even off treatment.

(DPFOF, ¶ 69). Dr. Burnett then emailed Dr. Hoftiezer and Dr. Baynton about setting up a conference call about Wright's condition and treatment. (DPFOF, ¶ 70). On May 6, 2013, Dr. Baynton responded to the May 3, 2013 email. (DPFOF, ¶ 71). Dr. Baynton emailed Dr. Burnett and copied Cervantes regarding Wright's white blood count history during previous treatment and Wright's current white blood count. (*Id.*). Dr. Baynton also indicated that Wright's liver biopsy showed that he had cirrhosis. (*Id.*).

On June 21, 2013, Dr. Baynton emailed Hoftiezer to update him on Wright's case. He informed Dr. Hoftiezer that they needed to discuss Wright's treatment. (DPFOF, ¶ 72). Dr. Baynton stated the following in his email:

> I think patient's position is, "My community care team offered neupogen as way to enable continued treatment when I got neutropenic on treatment, why won't DOC offer that as a way to resume treatment?"  Seems to me like a reasonable question, but also one to which there are multiple possible reasonable answers.  One way we could get an answer is indeed to send him to UW for a formal opinion, and I have no objection to doing that.  Another is to just address the questions to them as a theoretical, and if they say "bad idea that community team had," I think that too is a satisfactory approach.

(*Id.*).

On June 24, 2013, Dr. Baynton submitted a class 3 referral for Wright to be seen by UWHC Hepatology and this request was approved. (DPFOF, ¶ 73). That same day, Dr. Baynton emailed Cervantes indicating that DOC medical personnel wanted Wright to be seen by UWHC Hepatology for a formal opinion on the feasibility of treatment for Wright's HCV. (DPFOF, ¶ 74). On July 1, 2013, Dr. Baynton ordered for Wright to be scheduled for an appointment with UWHC Hepatology. (DPFOF, ¶ 75).

On August 2, 2013, Wright was seen at the UWHC Hepatology Clinic. (DPFOF, ¶ 76). UWHC ordered for labs to be done, a stress test and a mental health clearance after the stress test. (*Id.*). UWHC also noted that Wright wanted a liver biopsy done. (DPFOF, ¶ 77). However, UWHC was reluctant to order this if Wright's platelet count continued to be low. (*Id.*). UWHC was concerned that Wright was possibly cirrhotic, given his thrombocytopenia and stage 3 findings of his previous liver biopsy. (*Id.*). UWHC's diagnosis was Chronic HCV, genotype 1a.  UWHC also noted that Wright had a history of anxiety and depression. (DPFOF, ¶ 78).

On August 2, 2013, Dr. Hoftiezer referred Wright to undergo a stress test. (DPFOF, ¶ 79). On August 5, 2013, a complete blood count was done with respect to

Wright.  Again, Wright's white blood count, platelet count and neutrophil absolute were low. (DPFOF, ¶ 80). On August 19, 2013, Wright underwent a stress test, which showed Wright was likely negative for ischemia. (DPFOF, ¶ 81).

On August 29, 2013, Cervantes met with Wright via Telemedicine conference for a follow-up appointment. (DPFOF, ¶ 82). During the Telemedicine conference, Cervantes noted no visual problems and she discussed the stress test results with Wright.  (*Id.*). Cervantes told Wright that she would proceed with treatment for his HCV.  (*Id.*). Following the August 29, 2013 Telemedicine conference, Cervantes realized that she had not looked carefully enough at the paperwork she was given and failed to note Wright's funduscopic eye exam results. (DPFOF, ¶ 83). Cervantes's dictated note stated that Wright would not be able to start treatment without clarifying his eye problems.  (*Id.*). Cervantes ordered for Wright to be seen by an ophthalmologist for evaluation and that Wright's HCV treatment would be on hold until that was completed. (*Id.*).

On August 30, 2013, Dr. Baynton emailed Cervantes for clarification regarding her note for ophthalmologist evaluation. (DPFOF, ¶ 84). Because Dr. Baynton did not receive a response, he also emailed Cervantes for further clarification on September 4, 2013. (*Id.*). That same day, Dr. Baynton also emailed Dr. Chan, the DCI Optometrist, inquiring about Wright's last optical evaluation. (DPFOF, ¶ 85). On September 5, 2013, Dr. Baynton received an email from Dr. Chan indicating that Wright had been seen in July 2013 and has disseminated retinitis in the left eye and glaucoma for which he is being treated with latanoprost. (DPFOF, ¶ 86).

On September 9, 2013, Cervantes emailed Dr. Baynton in response to his September 4, 2013 email. (DPFOF, ¶ 87). That same day, Dr. Baynton emailed Cervantes

and informed her about the information from Dr. Chan. (DPFOF, ¶ 88). Dr. Baynton also asked if Cervantes wanted Wright seen by a UW Ophthalmologist or if she wanted to communicate directly with Dr. Chan. (*Id.*).

On September 25, 2013, Dr. Baynton responded to a HSR submitted by Wright about the medication that should have been faxed from UW. (DPFOF, ¶ 89). In his response, Dr. Baynton asked if Wright was referring to the HCV Treatment. (*Id.*). Assuming that he was, Dr. Baynton responded that Cervantes at UWHC had advised him that Cervantes believed Wright needed further evaluation of his eyes before HCV treatment could begin and that was being arranged. (*Id.*). At the time of responding to the HSR, Dr. Baynton noted that he had not yet received a response to his September 9, 2013 email, so Dr. Baynton emailed Cervantes requesting direction/confirmation as to whether she wanted Wright seen by a UW Ophthalmologist. (DPFOF, ¶ 90). Dr. Baynton informed her that he would go ahead with the DOC class III referral process. (*Id.*). On September 25, 2013, Dr. Baynton submitted a class III referral for Wright to be seen by Ophthalmology at UWHC. (DPFOF, ¶ 91). On September 26, 2013, Dr. Baynton received an email from Cervantes indicating that an ophthalmologist evaluation at UWHC was needed and the class III referral was approved. (DPFOF, ¶ 92-93). On September 27, 2013, Dr. Baynton ordered for Wright to be seen by Ophthalmology at UWHC. (DPFOF, ¶ 94).

On September 27, 2013, Dr. Baynton responded to a HSR submitted by Wright. (DPFOF, ¶ 95). In the HSR, Wright noted that Cervantes never informed him about an eye evaluation and he wanted to know when the evaluation would take place. (*Id.*). Dr. Baynton informed Wright that he was acting consistently with Cervantes's

recommendations and that DOC policy prohibited giving him advance notice of when his appointment would be. (*Id.*).

UWHC has scheduled Wright's Ophthalmology appointment and Wright will be seen before the end of the year. (DPFOF, ¶ 96). Dr. Baynton is currently treating Wright's HCV with medical monitoring, including exams and lab tests, and regular referrals/visits to the UWHC Hepatology clinic. (DPFOF, ¶ 97). Dr. Baynton plans to follow the advice of UWHC regarding treatment decisions for Wright. (*Id.*). Dr. Baynton continues to keep Dr. Hoftiezer appraised of Wright's condition and ongoing treatment decisions.  (DPFOF, ¶ 98).

Wright's HCV condition is not rapid and there is no medical reason to believe that the delay of ensuring that treatment is appropriate will adversely affect the outcome. (DPFOF, ¶ 99).

Based upon Dr. Baynton's professional judgment and expertise, and to a reasonable degree of medical certainty, he has provided Wright with appropriate medical care. (DPFOF, ¶ 100). All of Dr. Baynton's treatment decisions were done within the community health care standards and protocols of the DOC. (DPFOF, ¶ 101).

### D.  Wright's Relevant Offender Complaint.

On May 17, 2012, which was less than one month after Wright's intake as a DOC inmate, Wright filed Offender Complaint DCI-2012-10272. (DPFOF, ¶ 23-24, 102). The offender complaint alleged that Wright was being denied treatment for HCV. (*Id.*).  HSU Manger Dittmann was contacted by Institution Complaint Examiner Joanne Bovee as part of the investigation into this complaint. (*Id.*).  Dittmann then reviewed Wright's medical file and noted that two DOC physicians determined that treatment for HCV was not

appropriate at that time. (DPFOF, ¶ 103).  Wright was informed that treatment would not

be initiated and that his HCV would be continued to be monitored through

laboratory testing and follow-up visits with health care providers. (*Id.*). Based on the

information set forth in Wright's medical file, Dittmann reported to Bovee that Wright

was being provided with appropriate care. (DPFOF, ¶ 104). Wright's offender complaint

was then dismissed at the institution level and the Corrections Complaint Examiner level.

(DPFOF, ¶ 105).


### SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when there is

no genuine issue as to any material fact and when the moving party is entitled to a

judgment as a matter of law.  The moving party seeking summary judgment "always

bears the initial responsibility of informing the district court of the basis for its motion,

and identifying those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  "An adverse party may not rest upon mere allegations or denials of his

pleadings, but his response must set forth a specific showing that there is a genuine issue

for trial." *Id.* at 322.

There is a genuine issue of material fact only if any of the disputed facts might

affect the outcome of the case. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir.

1992).  A dispute concerning facts that are not material to a determinative issue does not

preclude summary judgment. *Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir. 1988).

"Only disputes over facts that might affect the outcome of a suit under the governing law

will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The moving party is "entitled to a judgment as a matter of law" when the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp.*, 477 U.S. at 323. If the nonmoving party "cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." *Anderson*, 477 U.S. at 249.

## ARGUMENT

## I.   WRIGHT'S DELIBERATE INDIFFERENCE CLAIMS FAIL AS A MATTER OF LAW.

The Eighth Amendment prohibits cruel and unusual punishment, and it imposes on states, through the Fourteenth Amendment, the duty to provide medical care to prisoners. *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007). Prison officials who are deliberately indifferent to an inmate's serious medical needs violate the Constitution. *Id.* To prove deliberate indifference to a serious medical need, the plaintiff must meet an objective standard and a subjective standard. *Dunigan v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must prove he or she suffers from a serious medical need. *Id.* Second, he or she must prove a state official acted with a culpable state of mind, which is deliberate indifference. *Id.* at 591. Wright's claim fails to meet either standard.

## A.  Wright Fails to Establish Serious Medical Need.

In determining whether a plaintiff has established a serious medical need, the condition itself does not necessarily establish a medical need. *See, e.g., Jackson v. Pollion*, 12-2682, 2013 WL 5778991, *3 (7th Cir. Oct. 28, 2013) ("Hypertension is a serious medical condition because of the long-term damage that it can do. But the issue in this case is whether the withholding of treatment during a brief period in the early stages of the condition in an otherwise healthy man in his mid-twenties was likely to cause serious, or indeed any, harm."). "No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic." *Id.*

In the instant case, there is no doubt that Hepatitis C is a serious medical condition. However, "the Eighth Amendment issue is not whether the infection itself is a 'serious medical need,' but rather whether [Wright] had a serious medical need for prompt interferon treatment." *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004); *see also Melendez v. Wright*, 9:05-CV-1614, 2008 WL 4757360 (N.D.N.Y. Oct. 29, 2008) (finding no serious medical need for HCV treatment and collecting cases). As in *Melendez*, Wright "has failed to establish that his Hepatitis C condition, [with chronically low absolute neutrophil counts], was a condition so serious that delaying medical treatment in the form of a pharmacological regimen would could cause serious detrimental effects to Plaintiff's health, such as a degeneration of his condition or some other detrimental affect on his daily activities." *See id.* Indeed, it is Dr. Baynton's

professional opinion that "Wright's HCV condition is not rapid and there is no medical reason to believe that the delay of ensuring that treatment is appropriate will adversely affect the outcome." (DPFOF, ¶ 99). Because Wright fails to establish serious medical need, the defendants are entitled to summary judgment.

## B.  The Defendants Were Not Deliberately Indifferent.

Even assuming Wright could establish serious medical need, Wright's claim fails because the defendants were not deliberately indifferent. Deliberate indifference is a high standard; it requires proof that the state officials actually knew of the inmate's serious medical need and that they disregarded it.  *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002).  Deliberate indifference is recklessness in the criminal law sense.  *See Smith-Bey v. Hospital Ad'r*, 841 F.2d 751, 759 (7th Cir. 1988).  Ordinary negligence, and even gross negligence, in the tort sense are not enough.  *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991); *Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir. 1991).

A prison inmate's dissatisfaction with the adequacy of medical treatment does not state a claim under 42 U.S.C. § 1983:

> Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations. A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition."

*Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *see also Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

If a decision is made by a health care professional, it is presumptuously valid. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996).  The Constitution does not require prison officials to administer the least painful treatment.  *Snipes*, 95 F.3d

at 592.  The Constitution is not a medical code that mandates specific treatment.  *Id.*
Questions of medical judgment do not form the basis of Eighth Amendment claims:

> [T]he question whether an X-ray – or additional diagnostic techniques or forms of
> treatment – is indicated is a classic example of a matter for medical judgment.  A medical
> decision not to order an X-ray, or like measures, does not represent cruel and unusual
> punishment.  At most it is medical malpractice, and as such the proper forum is the state
> court . . . .

*Estelle v. Gamble*, 429 U.S. 97,107-08 (1976).

In analyzing Wright's deliberate indifference claims against the defendants, each
defendant's actions must be reviewed independently.  Title 42 U.S.C. § 1983 creates a
cause of action based upon personal liability and predicated upon fault. An individual
cannot be held liable in a § 1983 action unless he caused or participated in an alleged
unconstitutional deprivation of rights. *Zentmeyer v. Kendall County*, 220 F.3d 805, 811
(7th Cir. 2000); *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996)); *Kelly v. Municipal
Courts of Marion County*, 97 F.3d 902, 909 (7th Cir. 1996).  Furthermore, allegations
against one individual cannot be considered against other defendants with different roles
in the alleged misconduct at issue.  *See, e.g., Brach v. City of Wausau*, 617 F. Supp. 2d
796, 802 (W.D. Wis. 2009) ("Defendants . . . had different roles in plaintiff James's
arrest. Because, under § 1983, a government official may be held liable only for his or
her own misconduct . . . their alleged misconduct must be considered individually."). As
set forth below, none of the defendants were deliberately indifferent.

### 1.  Dr. Baynton was not deliberately indifferent.

Wright claims that Dr. Baynton was deliberately indifferent in his medical
management of Wright's HCV infection.  The chronology of events set forth in the above
facts section compels the opposite conclusion. Dr. Baynton saw and corresponded with
Wright on many different occasions to discuss and clarify Wright's HCV history and

18

treatment implications. (DPFOF, ¶¶ 24, 26, 35, 47, 53, 59, 62).  Baynton also frequently scheduled and reviewed tests in order to continually monitor Wright's HCV condition and his absolute neutrophil count. (DPFOF, ¶¶ 24, 36, 46, 50, 55, 57, 59, 61). Wright's absolute neutrophil count was continually below the threshold necessary for safe HCV treatment.  (DPFOF, ¶¶ 21, 62). Dr. Baynton also conferred with Dr. Hoftiezer on a number of occasions and sought advice from the UW Hepatology Clinic. (DPFOF, ¶¶ 39, 66-72).  Dr. Baynton ultimately referred Wright to the UW Hepatology Clinic for additional treatment guidance.  (DPFOF, ¶¶ 73-75).

Courts have repeatedly found that decisions on HCV treatment are complex and rarely meet the level required for a deliberate indifference finding. *See Bender*, 385 F.3d at 1137 (granting summary judgment and finding no deliberate indifference in HCV treatment decision); *Black v. Alabama Dep't of Corr.*, 5:11-CV-3835-RDP-JHE, 2013 WL 5407495, *9-10 (N.D. Ala. Sept. 25, 2013) (collecting cases); *Holloway v. Corr. Med. Servs.*, 4:06CV1235 CDP, 2010 WL 908491 (E.D. Mo. Mar. 9, 2010); *Richardson v. Blanchette*, 3:03CV1621 (AWT), 2006 WL 496010, *11 (D. Conn. Mar. 1, 2006); *Melendez*, 2008 WL 4757360 at *5; *but see Roe v. Elyea*, 631 F.3d 843, 862 (7th Cir. 2011) (affirming a jury verdict of deliberate indifference based on a protocol of denying further testing and treatment for HCV infection *categorically* based on the expected length of the inmates' continued incarceration).

In addition, there can be no reasonable dispute that the decision to treat HCV is a complex decision requiring consideration of a variety of factors:

> [s]ynthetic interferon was released to the market some ten years ago. Until then, no treatment for the Hepatitis C virus existed. By January 2002, a more effective interferon treatment was available, involving a combination of pegylated interferon (interferon with

> polyethylene glycol) and ribavarin. Interferon treatment has serious potential side-effects, including nausea, anemia, depression, and decomposition of the liver. Its success rate is relatively low–15–30% for regular interferon and 40–50% for pegylated interferon treatment. The selection of patients for interferon treatment is highly individualized and depends upon many factors. Treatment is not appropriate for patients with advanced liver problems such as cirrhosis. Treatment for patients with mild liver problems may be safely deferred. Suitability for treatment is determined by measuring the degree of liver inflammation and fibrosis through a liver biopsy. However, even if the appropriate threshold levels of inflammation and fibrosis are present, treatment may be inappropriate if the patient is too young or too old, had a previous organ transplant, or suffers from depression, other mental health problems, heart disease, or untreated chemical dependency.

*Bender,* 385 F.3d 1135.

Like the actions of the defendants in the above-cited cases, it cannot be disputed that Dr. Baynton properly utilized the DOC guidelines and noted Wright's contraindications due to his chronically low absolute neutrophil count. The decision to treat HCV is undoubtedly complex. *See id.* Wright's own lay opinion regarding the propriety of treatment is not enough to prove his claim. Wright is required to show that Dr. Baynton's decisions were "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes*, 95 F.3d at 592. Wright has failed to make such a showing. *See id.*

### 2.  Dr. Hoftiezer was not deliberately indifferent.

Wright's deliberate indifference claims related to Dr. Hoftiezer also fail as a matter of law. Dr. Hoftiezer's principal involvement in Wright's medical treatment included consulting and corresponding with Dr. Baynton and others regarding the feasibility of HCV treatrment given the contraindications. (DPFOF, ¶¶ 39, 66-72). The chronology of events set forth in the above facts section demonstrates that Dr. Hoftiezer's actions were not "so blatantly inappropriate as to evidence intentional mistreatment likely

to seriously aggravate the prisoner's condition."  As such, Dr. Hoftiezer is also entitled to summary judgment.

### 3.  Defendant Dittmann was not deliberately indifferent.

Wright's deliberate indifference claim related to Dittmann does not fare any better. Dittmann is not a physician. (DPFOF, ¶ 5). At no time did Dittmann personally treat Wright or have any personal involvement with the specific decisions made regarding Wright's medical treatment. (DPFOF, ¶ 106). Dittmann's principal involvement in Wright's medical treatment included a response to the following two inquiries that occurred less than one month after Wright became a DOC inmate: (1) a May 2012 HSR; and (2) a May 2012 Offender Complaint. (DPFOF, ¶ 23-24, 29, 102). In response to both inquiries, Dittmann reviewed Wright's medical file and came to the conclusion that two physicians had already assessed the feasibility of treatment for Wright. (DPFOF, ¶ 29, 102-104). Dittmann's reliance on the medical opinions of those physicians was appropriate given the information in Wright's medical records.  (*Id.*).

## II.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Government officials performing discretionary functions are shielded from damage liability insofar as their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This defense relates to official acts, not to unofficial conduct.  *Clinton v. Jones*, 520 U.S. 681, 694 (1997). The qualified immunity defense "gives public officials the benefit of legal doubts." *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991). All but the "plainly incompetent" officials are protected. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Violation of clearly established state law is irrelevant. It is federal law that must be

clearly established if the plaintiff is to overcome the defense. *Davis v. Scherer*, 468 U.S. 183, 194 (1984).

Although qualified immunity is an affirmative defense, the plaintiff has the burden of demonstrating that defendant's error was clearly established:

> We emphasized in Anderson "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on different grounds*, *Pearson v. Callahan*, 129 S.Ct. 808 (2009); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Alvarado v. Picur,* 859 F.2d 448, 452 (7th Cir. 1988); *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir. 1987).

The issue of qualified immunity is a question of law for the court. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (*per curiam*). The United States Supreme Court recently held that it is no longer mandatory to "decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" in the qualified immunity analysis. *Pearson*, 129 S.Ct. at 815-18. Instead, a court may go directly to the question of "whether the right at issue was "clearly established" at the time of defendant's alleged misconduct." *Id.* ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.")

A factual dispute does not require denial of the defense. Qualified immunity may be available to a defendant "even if the existence of disputed issues of fact precludes a grant of summary judgment on the merits." *Green v. Carlson*, 826 F.2d 647, 652 n.4 (7th

Cir. 1987). Evidence concerning a defendant's subjective intent is "simply irrelevant." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998). The *Harlow* rule rejects an inquiry into state of mind in favor of a wholly objective standard. *Davis v. Scherer*, 468 U.S. at 191. Thus, except in extraordinary circumstances, a public official's actual knowledge is irrelevant to the determination of whether there is immunity from suit. *McKinley v. Trattles*, 732 F.2d 1320, 1324 (7th Cir. 1984). An allegation of malice does not defeat immunity if the defendant acted in an objectively reasonable manner. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Similarly, acting out of spite is irrelevant if the conduct is objectively lawful. *Anderson v. Romero*, 72 F.3d 518, 521 (7th Cir. 1995).

For Wright's Eighth Amendment claims, Wright must show that it was clear, to someone in defendants' positions, that defendants would violate Wright's constitutional rights by the manner they responded to Wright's potential HCV treatment. For the reasons stated above in Section I, Wright can make no such showing.

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that Defendants' Motion for Summary Judgment be GRANTED, dismissing the case in its entirety, with prejudice.

Dated this 31st day of October, 2013.

J.B. VAN HOLLEN
Attorney General

s/ Ann M. Peacock
ANN M. PEACOCK
Assistant Attorney General
State Bar #1046175

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-9230
(608) 267-8906 (Fax)
peacockam@doj.state.wi.us