IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL ANTHONY WRIGHT, SR.,

        Plaintiff,

v.                                Case No. 12-cv-870

DOCTOR BAYNTON, et al.,

        Defendants.

## DEFENDANTS' PROPOSED FIDNINGS OF FACT

The defendants, by their attorneys, submit these proposed findings of fact in support of defendants' motion for summary judgment.

**<u>Statement of the Case</u>**

1.      The plaintiff, Michael Wright (Wright), is an inmate who is incarcerated at Dodge Correctional Institution (DCI) and was at all times relevant to this action. (Dkt. #1, Complaint).

2.      The defendants are employees of the Wisconsin Department of Corrections (DOC). (*See* Dkt. #1, Complaint).

3.      Dr. Charles Baynton is employed by the DOC as a Physician within the Health Services Unit (HSU) at DCI.  (Affidavit of Baynton, ¶ 2).

4.      Dr. Scott Hoftiezer is employed by the DOC an Associate Medical Director and also works at DCI as a physician. (Affidavit of Hoftiezer, ¶ 2-3).

5.      Beth Dittmann is employed by the DOC as the HSU Manager at DCI. (Affidavit of Dittmann, ¶ 2).

6.     Pursuant to the Screening Order, Wright was allowed to proceed on his allegations that defendants, starting in May 2012, failed to provide adequate medical treatment for Wright's Hepatitis C (HCV) infection. (Dkt. #5, Screening Order at pgs. 3-5).

**Background Regarding Hepatitis C**

7.     HCV is an infectious disease affecting primarily the liver.  The infection is often asymptomatic, but chronic infection can lead to scarring of the liver and ultimately to cirrhosis, which is generally apparent after many years.  (Affidavit of Baynton, ¶ 8).

8.     Of every 100 persons infected with a positive HCV, about:

- 75 to 85 persons may develop long-term infection

- 70 persons may develop chronic liver disease

- 15 persons may develop cirrhosis over a period of 20 to 30 years

- Less than 3% of persons may die from the consequences of long term infection (liver cancer or cirrhosis).

(Affidavit of Baynton, ¶ 9, Exhibit C, Bates No. 000010).

9.     HCV infection, if treated, is treated with antiviral medications intended to clear the virus from a patient's body.  (Affidavit of Baynton, ¶ 10).

10.    Antiviral medications can cause depression and flu-like signs and symptoms, such as fatigue, fever and headache. Some side effects can be serious enough that treatment must be delayed or stopped in certain cases. (Affidavit of Baynton, ¶ 10).

11.    Even initiation of treatment is contraindicated for some individuals with HCV.  (Affidavit of Baynton, ¶ 12).

12.     Specific guidelines have been provided to DOC by Hepatology specialists from the University of Wisconsin Hospital and Clinics (UWHC) Hepatology Clinic. (Affidavit of Baynton, ¶ 11).

13.     DOC has guidelines in place to determine when to treat patients with HCV, to establish a care plan and to make sure inmates are making an informed choice for HCV treatment. True and correct copies of the DOC HCV Program, HCV Treatment Evaluation Care Plan and Consent/Refusal HCV Treatment Genotype 1 are attached and marked as Exhibits C, D and E to the Affidavit of Baynton. (Affidavit of Baynton, ¶ 8 & Ex. C-E).

14.     One contraindication for treatment is a low absolute neutrophil count. (Affidavit of Baynton, ¶ 12).

15.      Neutrophils are a type of fully developed white blood cells, which play a key role in the human body's ability to ward off infections and diseases. These cells engage and consume foreign substances, such as dead cells, bacteria, and waste products in the blood. The body also relies upon neutrophils to effectively break down and utilize proteins for more efficient use. (Affidavit of Baynton, ¶ 12).

16.     A low absolute neutrophil count is problematic because it is an indicator that a person's immune system is not as strong. (Affidavit of Baynton, ¶ 13).

17.     The drugs given to treat HCV are immunosuppressants and lower a person's defenses against other infections as they treat the HCV virus.  One needs a basically competent immune system to be able to tolerate treatment. (Affidavit of Baynton, ¶ 13).

3

18.     When neutrophils are low, a drug called Neupogen may be used to help increase the level of the neutrophils.  However, there are considerable risks in using Neupogen in patients with HCV.  (Affidavit of Baynton, ¶ 14).

19.     Neupogen causes some liver inflammation with elevated alkaline phosphatate levels in 21% of patients to whom it's given.  Normally a person with a healthy liver is in little danger from this, but there is greater risk to a patient who has liver damage to start with.  (Affidavit of Baynton, ¶ 14).

20.     Neupogen has other frequent systemic side effects, even when given to patients without hepatitis:

- Central nervous system: Fever (12%)
- Dermatologic: Petechiae (≤17%), rash (≤12%)
- Endocrine & metabolic: LDH increased, uric acid increased
- Gastrointestinal: Splenomegaly (severe chronic neutropenia: 30%; rare in other patients)
- Hepatic: Alkaline phosphatase increased (21%)
- Neuromuscular & skeletal: Bone/skeletal pain (22% to 33%; dose related), commonly in the lower back, posterior iliac crest, and sternum
- Respiratory: Epistaxis (9% to 15%)

All these potential side-effects have a greater risk of causing harm to someone who is already chronically ill with hepatitis. (Affidavit of Baynton, ¶ 14).

21.     At all times relevant to this case, Wright's absolute neutrophil count was below the level deemed acceptable for initiation of HCV treatment.   (Affidavit of Baynton, ¶ 15).

22.     With low absolute neutrophil count, Wright's risk of complications from the treatment would be much higher because his immune system is starting out lower than deemed safe for typical HCV treatment. (Affidavit of Baynton, ¶ 15).

**Chronology of Wright's Relevant Medical Care**

4

23.     On April 24, 2012, Dr. Hoftiezer ordered initial lab work as part of Wright's intake as an inmate at DCI. (Affidavit of Baynton, Exhibit A, Bates No. 000033-000034; Affidavit of Hoftiezer, ¶ 7).

24.     On April 30, 2012, Dr. Baynton met with Wright for his intake physical examination.  Dr. Baynton's evaluation included following up on Wright's report of having HCV.  Dr. Baynton requested outside records concerning Wright's previous treatment for his HCV and planned to review these records.  He also ordered a repeat liver chemistry (AST and ALT lab tests measuring liver protein levels) in 3 months and follow-up with Wright in 4 months. (Affidavit of Baynton, ¶ 18, Exhibit A, Bates Nos. 000005, 000010, 000012, 000024).

25.     On May 1, 2012, Wright submitted a Health Service Request (HSR) asking for previously prescribed medications, including those for HCV treatment. (Affidavit of Baynton, ¶ 19, Exhibit A, Bates No. 000077).

26.      On May 2, 2012, Dr. Baynton responded to Wright that, as he had explained to him during his intake physical, the decision as to whether DOC would restart Wright's previously interrupted HCV treatment is a complex one, and that it would be a matter of months before that question could be resolved. (Affidavit of Baynton, ¶ 19, Exhibit A, Bates No. 000077).

27.     On May 3, 2012, Wright submitted a HSR wanting to speak with Dr. Hoftiezer concerning his prescribed medication for HCV. (Affidavit of Baynton, ¶ 6, Exhibit A, Bates No. 000078; Affidavit of Hoftiezer, ¶ 8).

28.     On May 7, 2012, Dr. Hoftiezer responded to Wright's HSR, stating that HCV treatment could not be started at that time because Wright failed to complete the

treatment he was receiving in 2011.  Dr. Hoftiezer also informed Wright that he may be considered for new treatment in the future. (Affidavit of Hoftiezer, ¶ 8, Affidavit of Baynton, ¶ 6, Exhibit A, Bates No. 000078).

29.     On May 6, 2012, Dittmann responded to an interview/information request submitted by Wright.  In his request, Wright was asking about receiving medication for his HCV that was initially denied.  Dittmann responded to Wright directing to him to see Dr. Hoftiezer's May 7, 2012 response to Wright's Health Service Request dated May 3, 2012. (Affidavit of Baynton, ¶ 6, Exhibit A, Bates Nos. 000078-000079; Affidavit of Dittmann, ¶ 6).

30.     On May 30, 2012, Dr. Baynton reviewed Wright's chart and the medical records received from the Racine/Wheaton Franciscan Medical Group (WFMG).  (Affidavit of Baynton, ¶ 20, Exhibit A, Bates No. 000012).

31.     The WFMG records indicated that on July 8, 2011, Wright stopped his HCV treatment after 12 weeks due to side effects.  (Affidavit of Baynton, ¶ 20, Exhibit A, Bates No. 000012).

32.     On June 17, 2012, Wright submitted a HSR wanting an ultrasound or biopsy for his HCV condition. (Affidavit of Baynton, ¶ 21, Exhibit A, Bates No. 000081).

33.     On June 20, 2012, Nurse Burling saw Wright and spoke with him about his HCV concerns.  Nurse Burling informed Wright that there were no immediate plans for an ultrasound or biopsy of his liver related to Wright's HCV condition.  (Affidavit of Baynton, ¶ 22, Exhibit A, Bates No. 000013).

34.     At the June 20, 2012 appointment, Wright was advised that he could write to Dr. Baynton to discuss his HCV treatment if he did not want to wait until his next appointment with Dr. Baynton. (Affidavit of Baynton, ¶ 22, Exhibit A, Bates No. 000013).

35.     On August 29, 2012, Dr. Baynton saw Wright for follow-up of his HCV. Wright indicated the reason he stopped his HCV treatment was not due to side-effects, but to lack of insurance to cover the medication, Neupogen, which is used for low white blood count while undergoing HCV treatment.   (Affidavit of Baynton, ¶ 23, Exhibit A, Bates Nos. 000013).

36.     During the August 29, 2012 appointment, Wright indicated that he still wanted to go back on treatment.   (Affidavit of Baynton, ¶ 23, Exhibit A, Bates Nos. 000013).

37.     During the August 29, 2012 appointment, Dr. Baynton reviewed Wright's outside records from WFMG and noted that on July 8, 2011 there was telephone note stating the HCV treatment was stopped due to side effects, but a June 7, 2011 note in these same records reflect that Wright was tolerating the treatment well.   (Affidavit of Baynton, ¶ 23, Exhibit A, Bates Nos. 000013).

38.     Due to confusion in WFMG's medical records, Dr. Baynton ordered an ultrasound of Wright's liver, a repeat liver lab in 5 months and to follow-up in 6 months. (Affidavit of Baynton, ¶ 23, Exhibit A, Bates Nos. 000013, 000028).

39.     On August 31, 2012, Dr. Baynton discussed Wright's HCV condition with Dr. Hoftiezer.  (Affidavit of Baynton, ¶ 24, Exhibit A, Bates Nos. 000014-000015).

40.     In light of past interrupted treatment involving 2 drug therapy, Dr. Baynton consulted with Dr. Hoftiezer and questioned if a 3 drug therapy would be appropriate due to

7

Wright's previous treatment failures on the 2 drug therapy. (Affidavit of Baynton, ¶ 24, Exhibit A, Bates Nos. 000014-000015).

41.     Dr. Hoftiezer felt that, if appropriate, Wright may be eligible for 3 drug therapy. (Affidavit of Baynton, ¶ 24, Exhibit A, Bates Nos. 000014-000015).

42.     HCV treatment is provided at only a few institutions within the DOC. (Affidavit of Baynton, ¶ 24).

43.     DCI is not an institution that oversees 3 drug therapy for HCV therapy. (Affidavit of Baynton, ¶ 24).

44.     After Dr. Baynton's consultation with Dr. Hoftiezer, Dr. Baynton ordered a follow-up in one month and sent Wright a note indicating that he had reviewed his situation regarding HCV with his supervisor. (Affidavit of Baynton, ¶ 24, Exhibit A, Bates Nos. 000014-000015, 000028).

45.     After Dr. Baynton's consultation with Dr. Hoftiezer, Dr. Baynton also informed Wright that the potential for referral for another attempt at treatment was greater than he had thought, and that Dr. Baynton would see Wright back in the next month to discuss this further. (Affidavit of Baynton, ¶ 24, Exhibit A, Bates Nos. 000014-000015, 000028).

46.     On September 5, 2012, an abdominal ultrasound was completed and it indicated fatty liver. (Affidavit of Baynton, ¶ 25, Exhibit A, Bates No. 000037; Affidavit of Hoftiezer, ¶ 9).

47.     On September 26, 2012, Dr. Baynton saw Wright, who reaffirmed his interest in treatment. (Affidavit of Baynton, ¶ 26, Exhibit A, Bates Nos. 000015-000016).

48.     During the September 26, 2012 appointment, Wright informed Dr. Baynton that he was reluctant to go to Jackson Correctional Institution (JCI) for the 3 drug therapy. (Affidavit of Baynton, ¶ 26, Exhibit A, Bates Nos. 000015-000016).

49.     JCI is one of the institutions that provides the 3 drug therapy for HCV treatment.  (Affidavit of Baynton, ¶ 26).

50.     As a result of the September 26, 2012 appointment, Dr. Baynton ordered pre-HCV treatment work-up, including blood work, EKG (electrocardiogram) and a stress test.  Dr. Baynton also ordered follow-up with Wright in one month.  (Affidavit of Baynton, ¶ 26, Exhibit A, Bates Nos. 000015-000016, 000028).

51.     On September 28, 2012, a complete blood count was done.  Wright's white blood count, platelet count and neutrophil absolute were all low, which is not unexpected with an individual having HCV. (Affidavit of Baynton, ¶ 27, Exhibit A, Bates No. 000039).

52.     On October 8, 2012, Dr. Baynton wanted to be sure that Wright was willing to transfer to JCI before he scheduled Wright's stress test.  Dr. Baynton noted this based on Wright's prior comments that he did not want to go to JCI for treatment. (Affidavit of Baynton, ¶ 28, Exhibit A, Bates No. 000016).

53.     On October 24, 2012, Dr. Baynton saw Wright and noted that Wright was feeling well.  Wright was not on any medication other than eye drops for glaucoma. (Affidavit of Baynton, ¶ 29, Exhibit A, Bates Nos. 000016).

54.     During the October 24, 2012 appointment, Wright stated that he was willing to pursue HCV treatment at whatever institution necessary and was now willing to go to JCI.  (Affidavit of Baynton, ¶ 29, Exhibit A, Bates Nos. 000016).

55.     During the October 24, 2012 appointment, Dr. Baynton saw Wright's absolute neutrophil count from the September 28, 2012 lab was 1,330 and there were no other absolute neutrophil counts done previously since Wright's incarceration.  (Affidavit of Baynton, ¶ 29, Exhibit A, Bates Nos. 000016, 000029).

56.     Wright did not meet the criteria for HCV treatment because, per DOC treatment guidelines, his absolute neutrophil count must 1500 or higher. (Affidavit of Baynton, ¶ 29, Exhibit A, Bates Nos. 000016, 000029 and Exhibit C, Bates No. 000003).

57.      Dr. Baynton's plan was to repeat the lab count and see Wright back in 2 weeks. (Affidavit of Baynton, ¶ 29, Exhibit A, Bates Nos. 000016, 000029).

58.     On October 24, 2012, another lab was taken to check Wright's absolute neutrophil count and it was 1440, which was basically unchanged from the September 28, 2012 lab. (Affidavit of Baynton, ¶ 30, Exhibit A, Bates Nos. 000039-000040).

59.     On October 26, 2012, Dr. Baynton ordered a cancellation of his November 17, 2012 follow-up appointment with Wright.  Dr. Baynton informed Wright that his neutrophil count was low and again fell below the minimum needed for HCV treatment to be safe.  (Affidavit of Baynton, ¶ 31, Exhibit A, Bates No. 000017 & 000029).

60.     Dr. Baynton ordered Wright's follow-up for 6 months. (Affidavit of Baynton, ¶ 31, Exhibit A, Bates No. 000017 & 000029).

61.     On April 22, 2013, Dr. Baynton saw Wright for an ailment other than his HCV.  However, Dr. Baynton ordered repeat labs for Wright's HCV. (Affidavit of Baynton, ¶ 32, Exhibit A, Bates Nos. 000019, 000030).

62.     On April 26, 2013, Dr. Baynton saw Wright for follow-up of his HCV lab work.  Dr. Baynton informed Wright that his absolute neutrophil count was 1290 and still

less than the 1500 identified as protocol cutoff for eligibility for HCV treatment. Dr. Baynton explained the rationale for the protocol in place. (Affidavit of Baynton, ¶ 33, Exhibit A, Bates No. 000020).

63.     At the April 26, 2013 appointment, Dr. Baynton also discussed Wright's previous community treatment that was interrupted when he developed a neutrophil count of below 500 (the normal is approximately 1800). When Wright was not incarcerated, the community treatment physician had proposed Neupogen. (Affidavit of Baynton, ¶ 33, Exhibit A, Bates No. 000020).

64.     At the April 26, 2013 appointment, Wright indicated that DOC should provide Neupogen and then treat the HCV. Dr. Baynton discussed with Wright that decisions regarding treatment with Neupogen are made at a higher level of specialization and risks were still present. (Affidavit of Baynton, ¶ 33, Exhibit A, Bates No. 000020).

65.     Dr. Baynton's plan was to email to Lisa Cervantes, a Physician Assistant at the UWHC Hepatology Clinic, for additional guidance. (Affidavit of Baynton, ¶ 33, Exhibit A, Bates No. 000020).

66.     On April 26, 2013, Dr. Baynton emailed Cervantes for guidance regarding the feasibility of HCV treatment with prior interrupted treatment and use of Neupogen. (Affidavit of Baynton, ¶ 34, Exhibit B, Bates No. 000001).

67.     On May 2, 2013, Cervantes responded via email to Dr. Baynton's April 26, 2013 email. Cervantes advised that she would look into the issue and let Dr. Baynton know. (Affidavit of Baynton, ¶ 35, Exhibit B, Bates No. 000001).

68.     On May 2, 2013, Cervantes followed up by contacting Dr. David Burnett, DOC Bureau of Health Services (BHS) Medical Director. That same day, Dr. Burnett

responded that if Wright became neutropenic on treatment and it had not resolved, they should be evaluating why it had not resolved.  Dr. Burnett suggested that he would review it further and speak with Dr. Baynton about it. (Affidavit of Baynton, ¶ 36, Exhibit B, Bates No. 000003).

69.     On May 3, 2013, Cervantes emailed Dr. Burnett regarding the potential use of Neupogen to increase neutrophils and then to treat Wright's HCV.  This email stated as follows:

> I received a question from one of the DOC docs regarding a patient with neutropenia; he was treated before he was in the DOC with the 2-drug regimen and was responding.  Unfortunately, he developed rather severe neutropenia and Neupogen was prescribed.  The patient was not able to afford the medication and had to stop his hep C treatment.  His neutorpenia evidently continued after treatment was stopped.  He now wants us to treat him with Neupogen to get his neutrophils up, then treat his hep C.  I told the doc that medically it may be possible to treat him but that I wasn't sure if the DOC would approve it.  What do you think?  I'm inclined to not treat him, but I don't know if he's cirrhotic – I would assume so if his neutrophils are low even off treatment.

(Affidavit of Baynton, ¶ 37, Exhibit B, Bates No. 000004; Affidavit of Hoftiezer, ¶ 10).

70.     On May 3, 2013, Dr. Burnett emailed Dr. Hoftiezer and Dr. Baynton about setting up a conference call about Wright's condition and treatment. (Affidavit of Baynton, ¶ 38, Exhibit B, Bates No. 000003).

71.     On May 6, 2013, Dr. Baynton responded to the May 3, 2013 email.  Dr. Baynton emailed Burnett and copied Cervantes regarding Wright's white blood count history during previous treatment and Wright's current white blood count.  Dr. Baynton also indicated that Wright's liver biopsy showed that he had cirrhosis. (Affidavit of Baynton, ¶ 39, Exhibit B, Bates No. 000006).

72.     On June 21, 2013, Dr. Baynton emailed Hoftiezer to update him on Wright's case.   He informed Dr. Hoftiezer that they needed to discuss Wright's treatment.   Dr. Baynton stated the following in his email:

> I think patient's position is, "My community care team offered neupogen as way to enable continued treatment when I got neutropenic on treatment, why won't DOC offer that as a way to resume treatment?"   Seems to me like a reasonable question, but also one to which there are multiple possible reasonable answers.   One way we could get an answer is indeed to send him to UW for a formal opinion, and I have no objection to doing that.   Another is to just address the questions to them as a theoretical, and if they say "bad idea that community team had," I think that too is a satisfactory approach.

(Affidavit of Baynton, ¶ 40, Exhibit B, Bates No. 000005).   Dr. Hoftiezer responded that they would talk about it during the next week. (Affidavit of Baynton, ¶ 40; Affidavit of Hoftiezer, ¶ 11).

73.     On June 24, 2013, Dr. Baynton submitted a class 3 referral for Wright to be seen by UWHC Hepatology and this request was approved.   (Affidavit of Baynton, ¶ 41, (Exhibit A, Bates No. 000044; Affidavit of Hoftiezer, ¶ 12).

74.     On June 24, 2013, Dr. Baynton emailed Cervantes indicating that DOC medical personnel wanted Wright to be seen by UWHC Hepatology for a formal opinion on the feasibility of treatment for Wright's HCV. (Affidavit of Baynton, ¶ 42, Exhibit B, Bates No. 000006).

75.     On July 1, 2013, Dr. Baynton ordered for Wright to be scheduled for an appointment with UWHC Hepatology. (Affidavit of Baynton, ¶ 43, Exhibit A, Bates No. 000030).

76.     On August 2, 2013, Wright was seen at the UWHC Hepatology Clinic. UWHC ordered for labs to be done, a stress test and a mental health clearance after the stress test.  (Affidavit of Baynton, ¶ 44, Exhibit A, Bates Nos. 000045-000048).

77.    UWHC also noted that Wright wanted a liver biopsy done.    However, UWHC was reluctant to order this if Wright's platelet count continued to be low.    UWHC was concerned that Wright was possibly cirrhotic, given his thrombocytopenia and stage 3 findings of his previous liver biopsy. (Affidavit of Baynton, ¶ 44, Exhibit A, Bates Nos. 000045-000048).

78.    UWHC's diagnosis was Chronic HCV, genotype 1a.  UWHC also noted that Wright had a history of anxiety and depression. (Affidavit of Baynton, ¶ 44, Exhibit A, Bates Nos. 000045-000048).

79.    On August 2, 2013, Dr. Hoftiezer referred Wright to undergo a stress test. (Affidavit of Baynton, ¶ 6, Exhibit A, Bates Nos. 000050-000052; Affidavit of Hoftiezer, ¶ 14).

80.    On August 5, 2013, a complete blood count was done with respect to Wright.    Again, Wright's white blood count, platelet count and neutrophil absolute were low. (Affidavit of Baynton, ¶ 45, Exhibit A, Bates No. 000043).

81.    On August 19, 2013, Wright underwent a stress test, which showed Wright was likely negative for ischemia. (Affidavit of Baynton, ¶ 46, Exhibit A, Bates Nos. 000051-000052).

82.    On August 29, 2013, Cervantes met with Wright via Telemedicine conference for a follow-up appointment.  During the Telemedicine conference, Cervantes noted no visual problems and she discussed the stress test results with Wright.  Cervantes told Wright that she would proceed with treatment for his HCV.  (Affidavit of Baynton, ¶ 47, Exhibit A, Bates Nos. 000053-000055).

83.     Following the August 29, 2013 Telemedicine conference, Cervantes realized that she had not looked carefully enough at the paperwork she was given and failed to note Wright's funduscopic eye exam results.  Cervantes's dictated note stated that Wright would not be able to start treatment without clarifying his eye problems.  Cervantes ordered for Wright to be seen by an ophthalmologist for evaluation and that Wright's HCV treatment would be on hold until that was completed.  (Affidavit of Baynton, ¶ 47, Exhibit A, Bates Nos. 000053-000055).

84.     On August 30, 2013, Dr. Baynton emailed Cervantes for clarification regarding her note for ophthalmologist evaluation. Because Dr. Baynton did not receive a response, he also emailed Cervantes for further clarification on September 4, 2013. (Affidavit of Baynton, ¶ 48, Exhibit B, Bates Nos. 000008-000009; Affidavit of Hoftiezer, ¶ 16).

85.     On September 4, 2013, Dr. Baynton also emailed Dr. Chan, the DCI Optometrist, inquiring about Wright's last optical evaluation. (Affidavit of Baynton, ¶ 49, Exhibit B, Bates No. 000010).

86.     On September 5, 2013, Dr. Baynton received an email from Dr. Chan indicating that Wright had been seen in July 2013 and has disseminated retinitis in the left eye and glaucoma for which he is being treated with latanoprost. (Affidavit of Baynton, ¶ 50, Exhibit B, Bates No. 000010).

87.     On September 9, 2013, Cervantes emailed Dr. Baynton in response to his September 4, 2013 email. (Affidavit of Baynton, ¶ 51, Exhibit B, Bates No. 000011).

88.     On September 9, 2013, Dr. Baynton emailed Cervantes and informed her about the information from Dr. Chan.  Dr. Baynton also asked if Cervantes wanted Wright

seen by a UW Ophthalmologist or if she wanted to communicate directly with Dr. Chan. (Affidavit of Baynton, ¶ 52, Exhibit B, Bates No. 000011).

89.     On September 25, 2013, Dr. Baynton responded to a HSR submitted by Wright about the medication that should have been faxed from UW.  In his response, Dr. Baynton asked if Wright was referring to the HCV Treatment.  Assuming that he was, Dr. Baynton responded that Cervantes at UWHC had advised him that Cervantes believed Wright needed further evaluation of his eyes before HCV treatment could begin and that was being arranged. (Affidavit of Baynton, ¶ 53, Exhibit A, Bates No. 000083).

90.     On September 25, 2013, Dr. Baynton noted that he had not yet received a response to his September 9, 2013 email, so Dr. Baynton emailed Cervantes requesting direction/confirmation as to whether she wanted Wright seen by a UW Ophthalmologist. (Affidavit of Baynton, ¶ 54, Exhibit B, Bates No. 000012).  Dr. Baynton informed her that he would go ahead with the DOC class III referral process. (Affidavit of Baynton, ¶ 54).

91.     On September 25, 2013, Dr. Baynton submitted a class III referral for Wright to be seen by Ophthalmology at UWHC. (Affidavit of Baynton, ¶ 55, Exhibit A, Bates No. 000056).

92.     On September 26, 2013, Dr. Baynton received an email from Cervantes indicating that an ophthalmologist evaluation at UWHC was needed. (Affidavit of Baynton, ¶ 56, Exhibit B, Bates No. 000013).

93.     On September 26, 2013, Dr. Baynton's class III referral for Wright to be seen by UWHC Ophthalmology was approved. (Affidavit of Baynton, ¶ 57, Exhibit A, Bates No. 000056).

94. On September 27, 2013, Dr. Baynton ordered for Wright to be seen by Ophthalmology at UWHC. (Affidavit of Baynton, ¶ 58, Exhibit A, Bates No. 000032).

95. On September 27, 2013, Dr. Baynton responded to a HSR submitted by Wright.  In the HSR, Wright noted that Cervantes never informed him about an eye evaluation and he wanted to know when the evaluation would take place.  Dr. Baynton informed Wright that he was acting consistently with Cervantes's recommendations and that DOC policy prohibited giving him advance notice of when his appointment would be. (Affidavit of Baynton, ¶ 59, Exhibit A, Bates No. 000084).

96. UWHC has scheduled Wright's Ophthalmology appointment and Wright will be seen before the end of the year. (Affidavit of Baynton, ¶ 58).

97. Dr. Baynton is currently treating Wright's HCV with medical monitoring, including exams and lab tests, and regular referrals/visits to the UWHC Hepatology clinic. Dr. Baynton plans to follow the advice of UWHC regarding treatment decisions for Wright. (Affidavit of Baynton, ¶ 16, 60).

98. Dr. Baynton continues to keep Dr. Hoftiezer appraised of Wright's condition and ongoing treatment decisions.  (Affidavit of Hoftiezer, ¶ 17).

99. Wright's HCV condition is not rapid and there is no medical reason to believe that the delay of ensuring that treatment is appropriate will adversely affect the outcome. (Affidavit of Baynton, ¶ 61).

100. Based upon Dr. Baynton's professional judgment and expertise, and to a reasonable degree of medical certainty, he has provided Wright with appropriate medical care. (Affidavit of Baynton, ¶ 17, 65).

101.    All of Dr. Baynton's treatment decisions regarding Wright were done within the community health care standards and protocols of the DOC. (Affidavit of Baynton, ¶ 17, 65).

**Wright's Relevant Offender Complaint**

102.    On May 17, 2012, Wright filed Offender Complaint DCI-2012-10272 complaining that he was being denied treatment for HCV.  HSU Manager Dittmann was contacted by Institution Complaint Examiner Joanne Bovee as part of the investigation into this complaint. (Affidavit of Dittmann, ¶ 7, Exhibit A, Bates No. 000015).

103.    In May of 2012, Dittmann reviewed Wright's medical file and noted that two DOC physicians determined that treatment for HCV was not appropriate at that time. Wright was informed that treatment would not be initiated and that his HCV would be continued to be monitored through laboratory testing and follow-up visits with health providers.  (Affidavit of Dittmann, ¶ 8, Exhibit A, Bates No. 000002).

104.    Based on the information set forth in Wright's medical file, Dittmann reported to Bovee that Wright was being provided appropriate care. (Affidavit of Dittmann, ¶ 8, Exhibit A, Bates No. 000002).

105.    Wright's Offender complaint was then dismissed at the institution level and the Corrections Complaint Examiner level. (Affidavit of Dittmann, ¶ 7, Exhibit A, Bates Nos. 000002-000003 and 000006-000007).

106.    At no time did Dr. Hoftiezer or Dittmann provide any direct treatment to Wright. (Affidavit of Hoftiezer, ¶ 18; Affidavit of Dittmann, ¶ 10).

107.    At no time did the defendants violate any rights afforded to Wright. (Affidavit of Baynton, ¶ 67; Affidavit of Hoftiezer, ¶ 19; Affidavit of Dittmann, ¶ 11).

Dated this 31st day of October, 2013.

J.B. VAN HOLLEN
Attorney General

s/ Ann M. Peacock
ANN M. PEACOCK
Assistant Attorney General
State Bar #1046175

Attorneys for Defendants

Wisconsin Department of Justice
17 West Main Street, Post Office Box 7857
Madison, Wisconsin 53707-7857
Telephone:  (608) 266-9230